UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
LESIA TSURENKO,

                Plaintiff,

      - against -              **MEMORANDUM AND ORDER**

WTA TOUR, INCORPORATED and STEVE     24 Civ. 08518 (NRB)
SIMON,

              Defendants.
-------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Lesia Tsurenko ("plaintiff") brings this action against defendants WTA Tour, Incorporated ("WTA") and Steve Simon ("Simon," and together with WTA, "defendants") alleging breach of contract, negligence, negligent supervision and retention, and negligent infliction of emotional distress relating to defendants' actions in the wake of Russia's invasion of Ukraine in 2022. Presently before the Court is defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court grants defendants' motion.

**BACKGROUND**

Defendant WTA "is a New York non-profit membership corporation that organizes a circuit of international women's tennis tournaments" known as the WTA Tour. ECF No. 21 ("AC") ¶¶ 3, 10. WTA's membership consists of both female tennis players

and the owners of the tournaments on the WTA Tour.  Id. ¶¶ 3, 10; ECF No. 31 ("Mot.") at 3-4.

Defendant Simon, according to the Amended Complaint, is the Chief Executive Officer of WTA.[1]  AC ¶ 4.

Plaintiff is a citizen of Ukraine, a professional tennis player, and a member of WTA.  Id. ¶ 2.

## A. The WTA By-Laws and Annual Player Form

Plaintiff acknowledges that the relationship between WTA Members, including herself, and WTA is governed by WTA's Official Rulebook and By-Laws.  Id. ¶¶ 8, 12.  Plaintiff also executed the WTA's "Annual Player Form" "each year she participated on the Tour, including on May 3, 2023 and December 31, 2023."  Mot. at 4; AC ¶ 9; see ECF Nos. 32-2, 32-3.  By executing the Annual Player Form, plaintiff repeatedly agreed to "be bound by and comply with the Rulebook, the WTA Tour By-laws, and the decisions, rulings and actions of the WTA Tour, the WTA Tour Board of Directors . . . and the WTA Tour CEO with respect to all matters within their respective jurisdictions[.]"  ECF Nos. 32-2; 32-3.

The Annual Player Form that plaintiff executed contains a liability waiver under which plaintiff:

---

[1]     Defendants contend that Simon has not served as the CEO since August 2024, and he is now the Chairman of WTA's Board of Directors.  Mot. at 4.  Because the alleged actions that form the basis for plaintiff's complaint occurred prior to August 2024, the Court will, to the extent relevant, consider Simon to be WTA's CEO for purposes of this motion.

> "knowingly, voluntarily, fully, and forever waive[d] any and all claims, demands, losses, or causes of action that [she], [her] heirs or legal representatives may have against WTA Tour, WTA tournaments, WTA player members, the WTBA, the ITF and any WTA sponsor, and any director, manager, officer, employee, authorized agent or independent contractor of any of the foregoing (collectively, the "WTA Parties") . . . (ii) arising in conjunction with any decision, ruling, action or inaction of WTA Parties with respect to all matters within their respective jurisdictions or areas of operations."

AC ¶ 9 (second, third, and fourth alterations in the Amended Complaint).  The WTA By-Laws contain a similar waiver, under which plaintiff agreed to:

> "(d) Waive any and all claims or demands, whether for damages or otherwise, which the member might now or hereafter have against the Tour or any member of the Tour or against any director, officer or employee of the Tour in connection with or by reason of any decision, ruling or action of the membership of the Tour, any applicable class of membership of the Tour, the Board of Directors (or any authorized committee of the Board) or the officers or employees of the Tour with respect to all matters within their respective jurisdictions."

Id. ¶ 12.

### B. Russia's Invasion of Ukraine and Subsequent Events

On February 24, 2022, Russia invaded Ukraine.  Id. ¶ 14. Plaintiff alleges that "[a]t the moment of the invasion, Plaintiff was attending a Tennis Tournament in Guadalajara, Mexico," and "[a]s soon as the invasion started," Ukrainian tennis players were impacted.  Id. ¶ 15.  Specifically, "Russian players showed a different attitude to [the Ukrainian players] than before.  Russian

players stopped speaking to them and were ignoring them in the hallway." Id.

Shortly thereafter, on March 1, 2022, WTA announced that "players from Russia and Belarus will continue to be allowed to compete in international tennis events on Tour and at the Grand Slams. However, they will not compete under the name or flag of Russia or Belarus until further notice." Joint Statement by the International Governing Bodies of Tennis, WTA (Mar. 1, 2022), https://www.wtatennis.com/news/2510418/joint-statement-by-the-international-governing-bodies-of-tennis.[2]

Also in March 2022, plaintiff participated in a tournament in California. AC ¶ 16. The Ukrainian team at that event purportedly "expected that Russian and Belarus players would be banned from the tournament as other Russian and Belarus professional athletes were sanctioned and banned from participating in international sports events. However, the tournament proceeded as if nothing had happened." Id. As a result, "[t]he Ukrainian players initiated a meeting to address this issue," which was attended by

---

[2]    When considering a motion to dismiss the "district court . . . 'has the discretion to take judicial notice of internet materials.'" Ganske v. Mensch, 480 F. Supp. 3d 542, 545 (S.D.N.Y. 2020) (quoting BSH Hausgerate, GmbH v. Kamhi, 282 F. Supp. 3d 668, 670 n.1 (S.D.N.Y. 2017)). Further, "for purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not disputed and it is capable of accurate and ready determination, judicial notice should be taken." Hesse v. Godiva Choclatier, Inc., 463 F. Supp. 3d 453, 463 (S.D.N.Y. 2020) (internal quotation marks omitted). The Court finds that this webpage's authenticity is not disputed, and it is capable of accurate and ready determination, as such we will take judicial notice of this website.

-4-

plaintiff and 4 other players and coaches.  Id. ¶ 17.  At this meeting, WTA was represented by its then CEO, defendant Simon. Id. ¶ 18.  The Ukrainian team allegedly "tried to explain that if certain" Russian and Belarusian players "support the war in Ukraine, they should be banned because it is a Fair Play violation and elementary human rights."  Id.  In response, according to plaintiff, Simon "took an aggressive stance but stated that if Russian or Belarus players showed public support of the war, they would be banned from any tournament sponsored by the WTA."  Id.

Despite Simon's alleged promise, plaintiff claims that there were "multiple instances when Plaintiff informed Defendants that certain Russian and Belarus players publicly supported the war" and defendants did not ban the players.  Id. ¶ 19.

Specifically, plaintiff alleges the following incidents: in April 2022 during the Paris Roland Garros tournament, a Russian player "wore a shirt with [a] 'Tatneft' patch, knowing that [Tatneft] directly sponsored the war and was sanctioned by several Western countries," and "[w]hile Plaintiff informed Defendants about this fact, no action addressing this violation was taken by Defendants."  Id.

In May 2022, a Ukrainian player, Marta Kostyuk, "submitted a written complaint to the WTA after her refusal to play in a doubles match against Russian representatives Ms. Kudermetova and Ms.

Pavlyuchenkova due to the psychological impossibility of playing against Ms. Kudermetova, who, together with her husband, supported the invasion in Ukraine.  This complaint was sent to Mr. Simon and was completely ignored."  Id. ¶ 20.

"At the end of 2022, at a tournament in Romania, a Russian player . . . publicly supported Russia's invasion of Ukraine by publishing a post on her Instagram page condoning the Russian invasion."  Id. ¶ 23.  Plaintiff "filed a complaint with the WTA office, and she also sent a written complaint to [a] WTA lawyer . . . with a transcription and translation of [the] Instagram post."  Id.  Plaintiff was later informed that the Russian player "received only a formal warning."  Id.

At the Australian Open[3] on January 29, 2023, during a match between a Ukrainian player and a Russian player, "there were fans in the stands with Russian flags, wearing t-shirts with the image of Putin."  Id. ¶ 24.  An action that "severely disturbed and inflamed the Ukrainian team."  Id.  "There was no reaction from the tournament WTA security," and "[t]he next day, Plaintiff complained and demanded an explanation about this incident from

---

[3]     Defendants claim that "the Australian Open . . . is not a member of or governed by the WTA Tour . . . [but] is instead an independent tournament organized by Tennis Australia."  Mot. at 6.  Plaintiff responds that WTA nonetheless "oversees . . . the Australian Open as one of the four Grand Slam tournaments."  Opp. at 8 n.1.  Resolution of this factual dispute is immaterial to the Court's analysis of this motion.

the WTA, and [plaintiff's coach,] Mr. Nikita Vlasov, had three meetings with the tournament director[.]"  Id.

Also in 2023, plaintiff "initiated a meeting with Mr. Simon to discuss the severe stress Ukrainian players were experiencing when playing against Russian and Belarus players, who publicly support the war."  Id. ¶ 25.  According to plaintiff, Simon responded by saying "[i]t is OK to support the war.  It is another person's opinion and it should not hurt you[,]" and he further said that "Russian and Belarus players should be returned to the Olympic Games."  Id.  After this conversation with Simon, plaintiff "went to a WTA psychologist . . . for medical assistance" and also "apprised WTA's officials . . . about Mr. Steve Simon's position."  Id. ¶ 27.  Apparently, "the only solution the vice president [of WTA] suggested was to take a half-year break from the tournaments for all Ukrainian players."  Id.

Plaintiff then "had a match with a Croatian player, which she literally forced herself to play as she was mentally devastated."  Id. ¶ 28.  Plaintiff alleges that "nothing changed" after she informed WTA officials and the WTA psychologist of her conversation with Simon.  Id.

"Shortly thereafter," plaintiff was scheduled to play "Belarus player Aryna Sabalenka" and "one hour before the game . . . she had a panic attack and breath problems."  Id. ¶ 29.  "She

-7-

went to the supervisor, and without the ability to breathe, with shaking hands and twitching eyes, Plaintiff said to her supervisor that she would not play against Ms. Sabalenka due to a panic attack." Id. The supervisor allegedly "demanded that [plaintiff] play because otherwise, the WTA would lose money[,]" but plaintiff nonetheless withdrew from the match. Id.

Plaintiff further alleges that on two occasions, WTA's Chief of Security demanded that "Plaintiff's coach remove[] [the] Ukrainian flag from his shoulders," and on one occasion, "talked about the war in front of Plaintiff, which destroyed her ability to p[l]ay tennis and she lost the game for psychological reasons." Id. ¶ 31.

Plaintiff also recounts that "the Ukrainian team planned to hold a presentation for players to show the horrors of the war in Ukraine to the players, but it was blocked by Defendants," id. ¶ 19, and "when Russian and Belarus players were banned from the Wimbledon tournament in 2022, Defendants supported them with their efforts to participate in the tournament, totally ignoring the Ukrainian players' position," id. at 21. Further, "at some of Defendants' tournaments, they forget to remove Russian or Belarus flags," while "[a]t the same time, in August of 2022, at a tournament in Cincinnati, Ohio, during a match between two Russian players," and at the request of one of the Russian players, "a

girl wrapped in a Ukrainian flag was removed from the match by the security." Id. ¶ 22.

Finally, plaintiff alleges that on March 30, 2023, "a video call was held with the WTA Board, WTA CEO, and representatives of the Players Council[.]" Id. ¶ 32. At this meeting, "Plaintiff raised the issue of Mr. Simon's statements regarding support for the war, as well as the violation of Ukrainian team's rights." Id. Around this time, "Mr. Mykyta Vlasov made a written request to conduct an internal investigation and clarify the circumstances and consequences" of Simon's statements. Id. On June 20, 2023, "Plaintiff was informed by letter . . . that a case was opened against her coach . . . regarding violations of the WTA Code of Conduct." Id. "This affected Plaintiff['s] mental health, and she refused to participate" in a tournament the next day because of "mental pressure from WTA." Id. Plaintiff alleges "the incident involving [her coach] was fabricated to put pressure on Plaintiff." Id.

In October 2023, "Plaintiff received a decision from the WTA Committee in the case against" Simon "in which the Committee determined that Mr. Simon did not violate the Code of Conduct, nor did he violate any provision in the Employee Handbook." Id. ¶ 33. Plaintiff appealed the decision, but it was affirmed "in all respects." Id.

Following these events, plaintiff filed this lawsuit on November 8, 2024. ECF No. 1. On April 16, 2025, plaintiff filed an amended complaint with leave of this Court. ECF No. 21. On June 13, 2025, defendant filed a motion to dismiss the amended complaint, ECF Nos. 30-33, and the motion was fully briefed as of August 12, 2025, ECF No. 37.

### LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), a non-movant's pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the [pleaded] fact[s] . . . allow[] the court to draw the reasonable inference that the [movant] is liable for the misconduct alleged." Id. A court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor. Acticon AG v. China N.E. Petrol. Holdings Ltd., 692 F.3d 34, 37 (2d Cir. 2012). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Brown v. Daikin Am., Inc., 756 F.3d 219, 225 (2d Cir. 2014) (quoting Iqbal, 556 U.S. at 678).

-10-

**DISCUSSION**

In her Amended Complaint, plaintiff brings claims for (1) breach of contract; (2) negligence; (3) negligent supervision and retention; and (4) negligent infliction of emotional distress ("NIED").  AC ¶¶ 35-66.  We will consider each claim in turn.

Before doing so, however, it is necessary to consider the context in which plaintiff's claims arise.  Each of plaintiff's claims challenges the actions, inactions, and decisions of WTA, an international sports organization, and its employees.  In the Second Circuit, courts "are reluctant to interfere with the internal decisions of" private organizations, including sports organizations, instead "deferring to the principle that courts are ill-equipped to resolve conflicts involving the interpretation of the organization's own rules."  M'Baye v. World Boxing Ass'n, 429 F. Supp. 2d 660, 667 (S.D.N.Y. 2006) (citing Crouch v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 845 F.2d 397 (2d Cir. 1988)).  Indeed, district courts should generally "defer[] to [the sports organization's] interpretation of its own rules in the absence of an allegation that [the organization] acted in bad faith or in violation of any local, state or federal laws."  Crouch, 845 F.2d at 403.

Here, while plaintiff certainly may have preferred different courses of action, including "preventing interactions between

-11-

Ukrainian and Russian players" or "set[ting] the tournament schedule to avoid or minimize games between Ukrainian and Russian players," ECF No. 34 ("Opp.") at 16, she does not plausibly allege that defendants' actions were in bad faith or illegal.  As such, in analyzing each of plaintiff's claims, the Court is cognizant that it is appropriate to defer to WTA and its employees in matters involving the governance of WTA.

## I. First Cause of Action: Breach of Contract

Turning to plaintiff's first cause of action for breach of contract, defendants argue that plaintiff's claim should be dismissed on two distinct grounds.  First, plaintiff waived her right to bring a breach of contract claim, Mot. at 9-12, and second, plaintiff has failed to allege that defendant breached any contractual provision, Mot. at 12-15.  We will begin with plaintiff's purported waiver of her claim.

### a. Waiver of Claims

The parties agree that New York law applies to plaintiff's breach of contract claim pursuant to the WTA By-Laws.  Mot. at 9 n.8; Opp. at 11.  Under New York law, "[i]f the language of a release is clear and unambiguous," "a valid release constitutes a complete bar to an action on a claim which is the subject of the release."  Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V., 17 N.Y.3d 269, 276 (N.Y. 2011) (internal citations

and quotation marks omitted).  Clear and unambiguous releases will generally not be set aside unless there is a showing "that there has been fraud, duress or some other fact which will be sufficient to void the release."  Id. (internal citation and quotation marks omitted); see also Miller v. Brunner, 215 A.D.3d 952, 953-54 (N.Y. App. Div. 2023).

Plaintiff argues that her claims do not fall under either of the waivers because her claims "deal with mental abuse and harassment of Plaintiff rather than technical matters involving the organization of the tournament, member classification, and similar issues in connection with Defendants' operations[.]"  Opp. at 13.  Alternatively, plaintiff argues that whether plaintiff's claims fall under the waivers at issue in this case is a question of fact, which should not be determined on a motion to dismiss. Id.

The Court disagrees with both contentions.  In this case, the parties have mutually agreed to two clear and unambiguous waivers. The first, in WTA's By-Laws, waives "any and all claims or demands, whether for damages or otherwise . . . in connection with or by reason of any decision, ruling or action of the membership of the Tour, . . . the Board of Directors . . . or the officers or employees of the Tour with respect to all matters within their respective jurisdictions."  AC ¶ 12; ECF No. 32-4 at 3.  The

second, in the Annual Player Form, precludes "any and all claims, demands, losses, or causes of action . . . against WTA Tour, WTA tournaments, WTA player members . . . and any director, manager, officer, employee, authorized agent or independent contractor of any of the foregoing . . . arising in conjunction with any decision, ruling, action or inaction of WTA Parties with respect to all matters within their respective jurisdictions or areas of operations."  AC ¶ 9; ECF Nos. 32-2, 32-3.

Both of these waivers unambiguously waive "any and all claims" that plaintiff may have against the WTA and its employees and officers arising out of their decisions, rulings, actions, or inactions.  It is indisputable that plaintiff's breach of contract claim arises out of the decisions, rulings, actions, or inactions of the WTA and its employees.  Nor is there a carveout for matters of "mental abuse and harassment" as plaintiff alleges.  Further, the Court disagrees with plaintiff that defendants' alleged breach of contract does not relate to "technical matters involving the organization of the tournament, member classification, and similar issues in connection with Defendants' operations[.]"  Opp. at 13. On the contrary, the allegedly problematic conduct relates entirely to the organization of tournaments and similar issues in connection with defendants' operations, including who can and cannot play in defendants' tournaments, what flags and apparel

-14-

will or will not be allowed in the stands at defendants' tournaments, and other organizational and operational concerns.

Nor must the Court wait to make this determination at a later stage. "[T]he meaning of a contract is ordinarily a question of law" unless "a term or clause is ambiguous and the determination of the parties' intent depends upon the credibility of extrinsic evidence or a choice among inferences to be drawn from extrinsic evidence, then the issue is one of fact." Amusement Bus. Underwriters v. Am. Intl. Group, Inc., 66 N.Y.2d 878, 880–81 (N.Y. 1985) (internal citation omitted). Here, the waivers unambiguously cover the alleged actions that form the basis of plaintiff's claims and there is no question relating to the parties' intent. Thus, the waivers apply to bar plaintiff's claim for breach of contract on their face.

### i. Unconscionability

Despite the facial applicability of the waiver to plaintiff's claims, "Plaintiff's position is that the waivers are unconscionable and unenforceable." Opp. at 9. In New York, "[a] contractual provision will be deemed unenforceable on unconscionability grounds only where it is both procedurally and substantively unconscionable," meaning it "is so grossly unreasonable in light of the mores and business practices of the time and place as to be unenforceable according to its literal

-15-

terms." Zam & Zam Super Mkt., LLC v. Ignite Payments, LLC, 736 F. App'x 274, 277–78 (2d Cir. 2018) (emphasis added) (internal quotation marks omitted). The "substantive element looks to the content of the contract, per se[,]" Id. at 278, while procedural unconscionability looks to "the size and commercial setting of the transaction . . . whether deceptive or high-pressured tactics were employed . . . the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power," Gillman v. Chase Manhattan Bank, 73 N.Y.2d 1, 10–11 (N.Y. 1988).

Plaintiff argues that the "waivers of 'any and all claims' against Defendants [are] clearly unconscionable since [they] unreasonably deprive[] Plaintiff from asserting any cause of action without even getting any benefit from this bargain." Opp. at 10.

As an initial matter, the Court disagrees with the contention that plaintiff derives no benefit from this bargain. Agreeing to the contractual terms was a threshold requirement for plaintiff to become a WTA member. AC ¶ 12 (agreement to the waiver in the By-Laws is "a condition of a player's membership in the WTA"). Plaintiff herself points out that, while non-WTA members can still compete in WTA tournaments, WTA members have several advantages, including the ability "to be automatically eligible to enter the

main draw or qualifying events of WTA tournaments," and as a result, they have "regular access to higher-tier events." Opp. at 11-12.  Plaintiff points to several other advantages that WTA players have, including access to events with more prize money and additional "resources such as the Player Development Advisory Panel, orientation programs (e.g., 'Rookie Hours'), and access to coaching certifications[.]"[4]  Opp. at 12.  In other words, plaintiff derives ample benefit from the contractual bargain.[5] Further, plaintiff derives benefit specifically from the waiver provisions.  The waiver agreement that all WTA members must sign provides that each member waives claims against all other "WTA player members[.]"  AC ¶ 9; ECF Nos. 32-2, 32-3.  In other words, plaintiff is herself insulated from claims by operation of the waiver.

---

[4]    The Court notes that plaintiff cites to "Text generated by Grok" for each of the alleged benefits derived from being a WTA Member.  Opp. at 12.  It is the Court's understanding that "Grok" is an "AI Assistant with a twist of humor and a dash of rebellion" connected to the X (formerly "Twitter") platform. About Grok, Your Humorous AI Assistant on X, X (last visited March 24, 2026), https://help.x.com/en/using-x/about-grok.  We decline to take judicial notice of plaintiff's facts drawn from "Grok" because the results of a conversation with a "Humorous AI Assistant" are not facts that are "generally known within the trial court's territorial jurisdiction," nor that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  Thus, we note the benefits of being a WTA member that plaintiff references in her opposition not for the truth of plaintiff's contentions, but simply to point out that plaintiff recognizes that she receives benefits as a WTA member.

[5]    As an additional benefit, plaintiff has earned $6,924,996 in WTA Tour prize money throughout her career.  Career Prize Money Leaders at 3, WTA Tour (last visited Mar. 24, 2026), https://wtafiles.wtatennis.com/pdf/rankings/All_Career_Prize_Money.pdf.

Regardless of the benefit to plaintiff, she has not sufficiently alleged that the waivers at issue are either procedurally or substantively unconscionable. It may be that plaintiff was required to sign these waivers in order to become a WTA Member. However, that alone does not render the contract unconscionable. Ragone v. Atlantic Video at Manhattan Center, 595 F.3d 115, 122 (The fact that a contract was offered "on a take it or leave it basis . . . is not sufficient under New York law to render the [contract] provision procedurally unconscionable." (internal quotation marks omitted)). Plaintiff still had sufficient bargaining power and meaningful choice to decide not to sign the waivers and not to become a WTA member. Indeed, as plaintiff acknowledges, she would still be able to participate in professional tennis tournaments and earn "WTA ranking points[,]" albeit at "lower-tier events[,]" if she did not agree to sign these waivers. Opp. at 12. Nor is there any indication or allegation that defendants used deceptive or high-pressure tactics to force plaintiff into signing the waivers.

### ii. Contracts of Adhesion

Plaintiff furthers her argument by claiming that the waivers are unenforceable contracts of adhesion. "A contract of adhesion is a contract formed as a product of a gross inequality of bargaining power between parties." Klos v. Lotnicze, 133 F.3d

164, 168 (2d Cir. 1997) (internal citation and quotation marks omitted).  "A court will find adhesion only when the party seeking to rescind the contract establishes that the other party used 'high pressure tactics,' or 'deceptive language,' or that the contract is unconscionable."  Id. (emphasis added).  Indeed, where a signatory "had sufficient time to read the Release and seek clarification of its terms" and "[b]y signing it, she acknowledged that she had 'carefully read and fully underst[ood] the contents and legal ramifications of [the] agreement,'" the signatory does not make "the threshold showing of 'high pressure tactics or deceptive language' required to render the Release a contract of adhesion."  Milgrim v. Backroads, Inc., 142 F. Supp. 2d 471, 475–76 (S.D.N.Y. 2001) (second and third alterations in the original).

Plaintiff argues that the waivers are contracts of adhesion because of the unequal bargaining power between plaintiff and the WTA.  Specifically, "given the worldwide WTA monopoly, all WTA players are force[d] to accept unconditionally all the oppressive terms of the WTA contract without any negotiation of its terms if they want to be ranked professional players."  Opp. at 10–11.  Further, plaintiff argues, the parties did not deal with each other "at arm's length with relative equality of bargaining power." Opp. at 11 (quoting Westinghouse Elec. Corp. v. N.Y.C. Transit Auth., 82 N.Y.2d 47, 55 (N.Y. 1993)).

Here too the Court disagrees.  As noted above, plaintiff has not alleged that defendants employed any high-pressure tactics or deceptive language to force her to sign the waivers at issue. Additionally, the Annual Player Forms signed by plaintiff on multiple occasions affirm that plaintiff "read, underst[ood], consent[ed], and agree[d] to be bound by" the Form, which includes one of the waivers plaintiff signed, and the Annual Player Form also confirms that plaintiff "agree[d] to be bound by and comply with . . . the WTA Tour By-laws," which contain the other relevant waiver.   ECF Nos. 32-3, 32-3.   In other words, plaintiff "acknowledged that she had 'carefully read and fully underst[ood] the contents and legal ramifications of [the] agreement," thus precluding a finding of the threshold requirements for a contract of adhesion.  Milgrim, 142 F. Supp. 2d at 476 (alterations in the original).

Our conclusion is further supported by the fact that New York courts have routinely upheld contractual provisions conditioning participation in sporting events on a release of the organizer from liability.  See e.g., Lago v. Krollage, 78 N.Y.2d 95 (N.Y. 1991); Bufano v. Nat'l Inline Roller Hockey Ass'n, 272 A.D.2d 359 (N.Y. App. Div. 2000).

Accordingly, the waivers are not unconscionable, nor contracts of adhesion, and they apply to plaintiff's breach of

contract claim.  Thus, plaintiff's claim for breach of contract is barred by the waivers.

### b. Breach of Contract on its Merits

Even if the Court found that plaintiff had not waived her breach of contract claim, which we do not, plaintiff's claim still fails on the merits.  Plaintiff identifies only one contractual provision that has been violated.  AC ¶ 36.  Specifically, rule XVII.F.1 of the WTA handbook states that "it is an obligation for Tournament Support Personnel to refrain from engaging in conduct detrimental to the WTA or the WTA Tour or contrary to the integrity of the game of tennis and to ensure that Tournament partners adhere to the same standard in the activation of their partnership with the Tournament."  ECF No. 21-1 at 294; ECF No. 32-1 at 303; AC ¶ 36.  Under the WTA Code of Conduct, "[c]onduct detrimental to the WTA or the WTA Tour or contrary to the integrity of the game of tennis shall include, but not be limited to, public comments, whether or not to the media, and marketing and promotional campaigns and messaging, which unreasonably attack or disparage a Tournament, sponsor, player, official, the WTA, or the WTA Tour."  AC ¶ 37; ECF No. 21-1 at 295; ECF No. 32-1 at 303.

Plaintiff alleges that defendants breached this provision of the agreement because they "failed to provide reasonable accommodation to Ukrainian players, created or failed to rectify

tournament conditions that adversely affected Ukrainian players' ability to perform their obligation as members of WTA, mentally abused Ukrainian members, including Plaintiff, involved[6] [sic] in conduct contrary to the integrity of the game of tennis."  AC ¶ 40.

Defendants primarily contest this allegation on the basis that this provision is applicable to only "Tournament Support Personnel," which is a defined term that includes any (1) Tournament Director; (2) Tournament Owner; (3) Tournament operator; (4) Tournament employee; or (5) any designated agent of the tournament.  Mot. at 13 (citing ECF No. 32-1 at 289).  In defendants' view, WTA is not a "Tournament Support Personnel" and is thus not governed by this provision.  Plaintiff, for her part, responds that "'any tournament director, official, owner, operator, [or] employee' logically includes the WTA, at least under the theory of respondeat superior."  Opp. at 14.

Plaintiff's argument is misplaced.  The doctrine of respondeat superior does not apply to claims for breach of contract, and indeed, plaintiff cites to no authority to support the proposition that a breach of contract claim can rely on principles of respondeat superior, citing instead to cases that

---

[6]     The Court assumes that plaintiff intended to allege that WTA "engaged" in conduct contrary to the integrity of the game of tennis.  Defendants appear to share that understanding.  See Mot. at 14.

sound squarely in negligence.  See Opp. at 14 ("under the doctrine of respondeat superior 'a principal is [vicariously] liable for the negligent acts committed by its agents'") (second emphasis added) (alteration in the original).  Respondeat superior is not sufficient to save plaintiff's breach of contract claims where the contractual language makes clear that the terms do not apply to defendants.  The Court agrees with defendants that WTA is not included within the definition of Tournament Support Personnel, and thus WTA cannot have breached this provision as a matter of law.

Regardless, plaintiff's claim would still lack merit even if defendants could be considered "Tournament Support Personnel" for purposes of Rule XVII.F.1.  As discussed above, sports organizations are generally better equipped to enforce and interpret their own internal rules and regulations than the courts, absent bad faith or illegality.  Thus, it is WTA, not this Court, who is best equipped to determine what qualifies as "conduct detrimental to the WTA or the WTA Tour or contrary to the integrity of the game of tennis."  See Crouch, 845 F.2d at 403 ("certain standards, such as 'the best interests of baseball, [and] the interests of the morale of the players and the honor of the game . . . are not necessarily familiar to courts and obviously require some expertise in their application." (alterations in the

-23-

original)).  Even if plaintiff had not waived her claims and even if the rule allegedly breached applied to defendants, the Court would not be able to determine whether defendants' actions were detrimental to the WTA or contrary to the integrity of the game. Even then, the Court would "defer[] to the principle that courts are ill-equipped to resolve conflicts involving the interpretation of the organization's own rules."  M'Baye, 429 F. Supp. 2d at 667.

Accordingly, plaintiff's claim for breach of contract is dismissed.

## II.  Second Cause of Action: Negligence

Plaintiff's second cause of action alleges negligence. Defendants argue that plaintiff's negligence claim fails for four reasons: first, New York law does not recognize a cause of action for negligent performance of contract; second, defendant Simon did not voluntarily assume a duty to ban Russian and Belarusian players who supported the war; third, plaintiff has not alleged any well-pleaded facts supporting a claim for hostile work environment; and finally, in any event, there are no well-pled allegations supporting plaintiff's negligence claim.  The Court will examine each argument in turn.

### a. Negligent Performance of Contract

Under New York law, "no cause of action exists for negligent performance of a contract[,]" so "where a cause of action for

negligence . . . allege[s] no more than that plaintiffs were injured by defendant's actions with respect to [an] alleged contract, that cause of action should [be] dismissed[.]" Singh v. PGA Tour, Inc., 42 Misc. 3d 1225(A), 2014 WL 641311, at *4 (N.Y. Sup. Ct. Feb. 13, 2014) (internal quotation marks omitted) (second, third, and fourth alterations in the original).

Defendants contend that plaintiff's negligence claim is premised on alleged duties that "are contractual in nature because they arise exclusively from the Rulebook or a rule that Plaintiff alleges Simon promised would be put in place." Mot. at 15. Plaintiff in turn argues that her negligence claim is not premised on any contractual relationship, and she "has been harassed by Defendants' continued neglect to make reasonable accommodations, preventing interactions between Ukrainian and Russian players." Opp. at 16.

The Court is not convinced that plaintiff's negligence claim arises solely from the alleged breach of contract. Plaintiff's allegations go beyond merely alleging that defendant had a duty to perform under the contract and failed to do so. Instead, plaintiff bases her negligence claims on defendants' alleged failure to make reasonable accommodations for plaintiff and other Ukrainian players. These alleged failures are not contractual in nature but are instead premised on the purported existence of a duty to

protect plaintiff from unforeseen mental and emotional harm.  See
Opp. at 16–18.  Thus, New York's bar on negligent performance of
contract will not serve as a basis for dismissal here.  That does
not mean, however, that plaintiff's negligence claim has merit.

### b. Ordinary Negligence

Fatal to plaintiff's negligence claim is her failure to
plausibly allege both (1) the existence of a duty on which her
claim can be premised and (2) a breach of any duty.  As a general
matter, "[t]o establish a prima facie case of negligence under New
York law, a plaintiff must demonstrate that the defendant owed him
or her a duty of reasonable care, a breach of that duty, and a
resulting injury proximately caused by the breach."  Elmaliach v.
Bank of China Ltd., 110 A.D. 3d 192, 199 (N.Y. App. Div. 2013)
(citations omitted).

Plaintiff attempts to create a duty to keep sporting endeavors
"free from emotional . . . abuse" by pointing to several federal
statutes, see Opp. at 16–17, but these statutes are inapposite in
that they apply to the United States Olympic & Paralympic Committee
and related organizations' governance of amateur sports.  For
example, 36 U.S.C. § 220505 outlines the powers and duties of the
United States Olympic & Paralympic Committee.  Similarly, 26 U.S.C.
§ 220524 applies to "national governing bodies," a term that is
defined to include any "amateur sports organization, a high-

performance management organization, or a paralympic sports organization that is certified by the" United States Olympic and Paralympic Committee.  36 U.S.C. § 220501(b)(9).  Finally, 36 U.S.C. § 220503 sets forth the purposes of the "corporation," a term that again is defined not to include entities like the WTA. 36 U.S.C. § 220501(b)(7).  Nothing in these statutes suggests that they govern defendants' actions.

The fact that plaintiff is unable to point to any statutory framework that applies to defendants in this case is telling. Clearly, where Congress intends to impose certain duties on sporting committees and organizations it knows how to do so, and it has done so at some length in the context of Olympic and amateur athletics.  It has not, however, done so in the context of professional tennis.  Congress's decision not to do so makes sense where, as here, it is the private sports organizations who are best equipped to govern their own internal affairs, not the legislature, nor the courts.

Perhaps in recognition of this reality, plaintiff points to New York case law for the proposition that "organizers of sporting activities owe a duty to exercise reasonable care to protect participants 'from injuries arising out of unassumed, concealed, or unreasonably increased risks.'"  Opp. at 17 (citing Benitez v. New York City Bd. of Educ., 73 N.Y.2d 650, 654 (N.Y. 1989) and

Morgan v. State, 90 N.Y.2d 471, 485 (N.Y. 1997)).  Plaintiff argues that this proposition "[p]resumably . . . include[s] emotional harm alleged here by Plaintiff, as this type of harm is not inherent to the game of tennis."  Opp. at 17.

No such duty can be presumed.  The cases cited by plaintiff each concern physical injury to the plaintiff.  In Benitez, the New York Court of Appeals reversed a jury verdict for a paralyzing injury suffered by the plaintiff during a high school football game and dismissed the complaint because the plaintiff failed to prove breach of any duty.  73 N.Y.2d at 654.  Specifically, the Court of Appeals found that the trial court had "erroneously instructed the jury that a school owes a student voluntarily competing in an interscholastic high school football game the more protective duty and standard of care of a prudent parent[.]"  Id. at 656 (citations omitted).  Instead, the Court of Appeals held that "a board of education, its employees, agents and organized athletic councils must exercise ordinary reasonable care to protect student athletes . . . from unassumed, concealed or unreasonably increased risks[.]"  Id. at 658.

Similarly, in Morgan, the Court of Appeals affirmed the dismissal of three complaints, finding that the defendants "owed the respective plaintiff athletes in those cases no duty of care, because the injured parties there assumed inherent risks as part

of their particular participatory activities[.]"  90 N.Y.2d at 479.  As to one remaining complaint, the Court of Appeals in Morgan reversed the dismissal of the complaint where the plaintiff, while playing tennis at a facility owned by the defendant, was injured when he "snagged his foot in a torn vinyl hem at the bottom of a net dividing the indoor tennis courts."  Id. at 482.  As to that plaintiff, the Court of Appeals reasoned that "because a torn net is not an 'inherent' part of the game of tennis in and of itself, [plaintiff] should not be deemed legally to have assumed the risk of injuries caused by his tripping over" the net.  Id. at 488.

In other words, when courts have found that sports associations owe a duty to their players, those duties relate to ensuring players' physical safety, not their emotional wellbeing.

Plaintiff points to no authority that establishes any duty on behalf of defendants to protect plaintiff from emotional injury and discomfort caused by the politically motivated actions and opinions of other players and fans relating to ongoing geopolitical events.  Nor will this Court create such a duty.  In the absence of such a duty, the actions alleged in plaintiff's complaint are insufficient to maintain a cause of action for negligence under the ordinary duty of care owed to participants in athletic activities.

### c. Defendants Did Not Assume a Duty to Ban Russian and Belarusian Players

Failing to allege a duty under the ordinary duty of care, plaintiff argues that Simon "voluntarily assumed a duty to ban Russian or Belarusian players if they showed public support of the war[.]"  Opp. at 18.  Thus, plaintiff argues, a "special relationship" or "duty" was formed.  Id.

In New York, a "defendant owes an assumed duty of care when his or her conduct places the plaintiff 'in a more vulnerable position than [she] would have been in had [the defendant] never taken any action at all.'"  Kloner v. United States, 196 F. Supp. 3d 375, 386 (E.D.N.Y. 2016) (quoting Tavarez v. Lelakis, 143 F.3d 744, 746–47 (2d Cir. 1998)) (second alteration in the original). Put differently, "a defendant can only be held liable for breach of an assumed duty . . . where the plaintiff shows reliance on the defendant's course of conduct, such that the defendant's conduct placed [her] in a more vulnerable position than [she] would otherwise have been in had the defendant done nothing."  Beadell v. Eros Management Realty, LLC, 229 A.D.3d 43, 50 (N.Y. App. Div. 2024) (internal quotation marks omitted).  Furthermore, to be actionable, "[t]hat reliance . . . must be reasonable."  Doe 7015 v. Elektra Entertainment Grp. Inc., 2023 WL 2744102, at *8 (S.D.N.Y. Mar. 31, 2023).

Defendant argues that plaintiff's negligence cannot be premised on an assumed duty because plaintiff has not alleged that she detrimentally relied on defendants' actions. In other words, "[t]he mere fact that Simon allegedly promised to remove certain players does not establish a course of conduct on which [plaintiff] could rely." Mot. at 18. The Court agrees.

Plaintiff alleges a special duty exists on the basis of Simon's purported promise "that if Russian or Belarus players showed public support of the war, they would be banned from any tournament sponsored by the WTA." AC ¶ 18; accord Opp. at 18. Plaintiff argues that this alleged promise put her in a worse position than she would have been without it "as she reasonably expected to avoid playing against Russian or Belarusian players, who publicly supported the war" and "[a]s such, her emotional injury was substantially more significant when she was unexpectedly forced to compete against those players[.]" Opp. at 18.

The Court finds that plaintiff's alleged reliance on Simon's purported promise was unreasonable. Plaintiff asked Simon to ban players from Russia and Belarus who supported the war in Ukraine. In other words, plaintiff sought to penalize Russian and Belarusian players for supporting their home countries while she herself would receive benefits, including the banning of her competitors and

reorganization of matches and schedules, on account of her support for her own home country.  As defendants point out, "if WTA did what Plaintiff wanted, it would be violating the rights of WTA's other player members."  Mot. at 19 n.13.

Further undermining plaintiff's reliance on Simon's purported promise is the fact that Simon did not have the authority to ban players without a vote from the WTA Board.  Mot. at 18 (citing WTA Rule XVII(D)(13)(a)(ii)); see ECF No. 32-1 at 299.  Indeed, if Simon were to have done so, it would have directly contradicted WTA's formal policy statement that "players from Russia and Belarus will continue to be allowed to compete in international tennis events on Tour and at the Grand Slams[, but] they will not compete under the name or flag of Russia or Belarus until further notice." Joint Statement by the International Governing Bodies of Tennis, WTA (Mar. 1, 2022), https://www.wtatennis.com/news/2510418/joint-statement-by-the-international-governing-bodies-of-tennis.  Thus, plaintiff could not have reasonably relied on any alleged promise by Simon.

Accordingly, plaintiff has alleged no duty upon which her negligence claim could be premised.

### d. Plaintiff Alleges No Actionable Breach of Duty

Even if plaintiff plausibly alleged that defendants owed her a duty, she has not sufficiently alleged that any such duty has

been breached.  That failure is independently sufficient to dismiss plaintiff's negligence claims.  Plaintiff argues that defendants breached a duty owed to her through their "continued neglect to make reasonable accommodations, preventing interactions between Ukrainian and Russian players."  Opp. at 16.  Plaintiff contends, "[a]t a minimum, Defendants could have set the tournament schedule to avoid or minimize games between Ukrainian and Russian players, and vigorously enforce[d] their own tournament rules to prevent unreasonable emotional pressure caused by the prohibited display of the symbols of the Russian Federation[.]"  Id.

It cannot be said, however, that defendants' failure to make these accommodations constitutes a breach of any duty.  Plaintiff's self-described "reasonable accommodations" are anything but reasonable.  Plaintiff's proposed accommodations would effectively require this Court to mandate that anytime there is a global conflict, the WTA must (1) determine which country involved is deserving of condemnation; (2) ban players from that country; or alternatively (3) arrange the international tennis schedule at all events to avoid interactions between players from that country and any other country involved; and (4) prohibit all expressions of support by players and fans from that country.  Plaintiff's proposals would go far beyond any common law requirement and

involve the Court in oversight of the internal decisions of a private sports league.

Finally, it should be recalled that WTA did engage in reasoned decision making following Russia's invasion of Ukraine. Specifically, WTA, alongside the other major governing bodies of international professional tennis, determined that "players from Russia and Belarus will continue to be allowed to compete in international tennis events on Tour and at the Grand Slams. However, they will not compete under the name or flag of Russia or Belarus until further notice." Joint Statement by the International Governing Bodies of Tennis, WTA (Mar. 1, 2022), https://www.wtatennis.com/news/2510418/joint-statement-by-the-international-governing-bodies-of-tennis.   This exercise of judgment that considers the realities of Russia's invasion of Ukraine, its potential impacts upon players from all the countries involved, and the need to be fair to players from Russia and Belarus is the kind of decision making that the case law directs is best undertaken by the organization, not the Court. See Crouch, 845 F.2d at 403; M'Baye, 429 F. Supp. 2d at 667.

In sum, plaintiff has not alleged a breach of any duty and plaintiff's negligence claim is accordingly dismissed.

### e. Hostile Work Environment

Perhaps recognizing that her negligence claim lacks merit, plaintiff argues in addition that her "negligence claim included a hostile work environment claim." Opp. at 19. However, beyond scant usages of the words "hostile environment" in connection with plaintiff's negligence and NIED claims, AC ¶¶ 45, 61, plaintiff does not plead the elements of a claim for hostile work environment in her Amended Complaint. See AC ¶¶ 35-66. It is "axiomatic that the [Amended] Complaint cannot be amended by the briefs in opposition to a motion to dismiss." O'Brien v. National Property Analysts Partners, 719 F. Supp. 222, 229 (S.D.N.Y. 1989); Touchstone Research Group LLC v. United States, 2019 WL 4889281, at *3, n.5 (S.D.N.Y. Oct. 3, 2019) (same). Accordingly, plaintiff's purported hostile work environment claim is dismissed.[7] See Oliver v. Military Dep't, 2023 WL 2700709, at *7 (M.D. La. Mar. 29, 2023) (Dismissing a Title VII hostile work environment claim because "[a]rguments of counsel in a brief are not a substitute for properly pleaded allegations, and it is axiomatic that a complaint cannot be amended by briefs in opposition to a motion to dismiss.") (internal quotation marks omitted).

---

[7]    The fact that defendants advanced arguments to dismiss plaintiff's purported hostile work environment claim, Mot. at 19-21; Reply at 8-9, does not change the Court's conclusion. Indeed, the parties' exchange only underscores the deficiencies in plaintiff's pleadings.

### III. Third Cause of Action: Negligent Supervision or Retention

Plaintiff's third cause of action alleges negligent supervision or retention.  Under New York law, a claim for negligent supervision or retention requires "in addition to the standard elements of negligence . . . (1) that the [alleged] tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels."  Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004) (per curiam) (internal citations and quotation marks omitted).  Further, for a claim for negligent supervision or retention to be viable, the employee "must not be acting within the scope of his or her employment; [for] in that situation the employer [would] only be liable . . . vicariously under the theory of respondeat superior, [and] not for negligent supervision or retention."  Rich v. Fox News Network, LLC, 939 F.3d 112, 129-30 (2d Cir. 2019) (internal quotation marks omitted) (alterations in the original); I.M. v. United States, 362 F. Supp. 3d 161, 207 (S.D.N.Y. 2019) ("New York law does not permit a claim for negligent hiring, training, retention[,] or supervision where the defendants act in the scope of their employment.") (internal

-36-

citations and quotation marks omitted) (alteration in the original).

Defendants argue that plaintiff's claim for negligent supervision or retention must fail for three independent reasons: (1) Simon did not commit a tort or act of negligence against plaintiff; (2) Simon's alleged conduct was within the scope of his employment; and (3) WTA was not on notice of any alleged propensity of Simon to engage in tortious conduct. Mot. at 22-25. Defendants' second argument is dispositive.

### a. Scope of Employment

Plaintiff's claim for negligent retention or supervision must fail as a matter of law because there can be no doubt that Simon was acting within the scope of his employment. "An act is considered to be within the scope of employment if it is performed while the employee is engaged generally in the business of his employer, or if his act may be reasonably said to be necessary or incidental to such employment." Harisch v. Goldberg, 2016 WL 1181711, at *14 (S.D.N.Y. Mar. 25, 2016) (internal quotation marks omitted) (citing Holmes v. Gary Goldberg & Co., 838 N.Y.S.2d 105, 106 (N.Y. App. Div. 2007)). It is clear from the face of plaintiff's complaint that each of the alleged actions by Simon that make up the basis of plaintiff's claims occurred while Simon

was "engaged generally in the business of his employer" and was therefore acting within the scope of his employment.

Plaintiff alleges that Simon made the promise to ban players who supported Russia's war in Ukraine during a meeting initiated to address the Ukrainian players' expectation that Russian and Belarusian players would be banned from a WTA tournament.  AC ¶¶ 16-18.  Plaintiff acknowledges that Simon acted as WTA's representative during that meeting.  Id. ¶ 18.  The same is true of the comments that plaintiff alleges Simon made to her at the 2023 Indian Wells Tournament.  Id. ¶ 25.  There, plaintiff again initiated a conversation with Simon to "discuss the severe stress Ukrainian players were experiencing when playing against Russian and Belarus players, who publicly support the war."  Id.  Further, plaintiff attributes certain inaction in the face of written complaints submitted to the WTA concerning "Russian representatives Ms. Kudermetova and Ms. Pavlyuchenkova" to Simon, alleging that the "Complaint was sent to Mr. Simon and was completely ignored."  Id. ¶ 20.

These allegations necessarily relate to Simon in his capacity as the then-CEO of WTA, and each of Simon's actions were performed "while [Simon was] engaged generally in the business of his employer," or "may be reasonably said to be necessary or incidental to such employment."  Harisch, 2016 WL 1181711, at *14.

Thus, Simon was acting within the scope of his employment when he undertook these alleged actions, and plaintiff's claim for negligent supervision or retention is dismissed.

### IV.  NIED

Finally, plaintiff's fourth cause of action alleges negligent infliction of emotional distress.  "To plead a negligent infliction of emotional distress claim under New York law, a plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm."  Francis v. Kings Park Manor, Inc., 992 F.3d 67, 81 (2d Cir. 2021) (citing Ornstein v. N.Y.C. Health & Hosps. Corp., 10 N.Y.3d 1, 6 (N.Y. 2008) and Taggart v. Costabile, 131 A.D.3d 243, 252-53 (N.Y. App. Div. 2015)).[8]  Defendants chiefly argue that plaintiff has failed to allege the first and fourth elements of NIED.  Mot. at 25-26.

As discussed above, supra pp. 26-34, plaintiff has not alleged that defendants owed a duty to plaintiff, nor that any such duty

---

[8]    Inexplicably, plaintiff in her briefing provides the elements for intentional infliction of emotional distress, rather than negligent infliction of emotional distress.  Opp. at 22.  Plaintiff's complaint unambiguously pleads only a cause of action for negligent infliction of emotional distress.  AC ¶¶ 60-66.  Thus, the Court considers plaintiff's claim to sound in negligent infliction of emotional distress.  Nonetheless, plaintiff's claim would fail even if it were a claim for intentional infliction of emotional distress because she has not adequately pled "extreme and outrageous conduct," nor that defendants had an "intent to cause, or disregard of a substantial probability of causing, severe emotional distress[.]"  Howell v. New York Post Co., 81 N.Y.2d 115, 121 (N.Y. 1993).

was breached. The same reasoning applies here, and thus, plaintiff's claim fails at the threshold.

Nonetheless, as to the Fourth element, a plaintiff may satisfy this element by pleading "that the breach of the duty owed directly to the [plaintiff] . . . endangered [her] physical safety or caused [her] to fear for [her] physical safety," or by alleging a "particular type of negligence [that] is recognized as providing an assurance of genuineness, as in cases involving the mishandling of a corpse or the transmission of false information that a parent or child had died." Taggart v. Costabile, 131 A.D.3d 243, 253 (N.Y. App. Div. 2015). Thus, NIED claims are limited to actions that are "comparable to the extreme and outrageous conduct that must be established in order to prove intentional infliction of emotional distress." Id. Plaintiff is correct that "a breach of a duty of care resulting directly in emotional harm is compensable even though no physical injury occurred,"[9] but even then, "the claim must possess 'some guarantee of genuineness[.]'" NY Design Ctr., Inc., 215 A.D.3d at 9.

Plaintiff's complaint is devoid of any plausible allegation that defendants endangered her physical safety or caused her to fear for her physical safety. Thus, plaintiff's NIED claim can

_____

[9]    Opp. at 22 (quoting Brown v. NY Design Ctr., Inc., 215 A.d.3d 1, 9 (N.Y. App. Div. 2023).

only proceed if she has alleged a particular type of negligence comparable to those recognized in Taggart. It is evident that none of the actions allegedly taken by defendants rise to a level sufficient to establish the fourth element of NIED. Defendants' alleged actions do not amount to conduct comparable to instances of "the mishandling of a corpse or the transmission of false information that a parent or child had died." Taggart, 131 A.D.3d at 253. Thus, plaintiff's claim for NIED is dismissed.

## CONCLUSION[10]

For the foregoing reasons, the Court grants defendants' motion to dismiss.[11] The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 30 and close the case.


Dated:    March 25, 2026
          New York, New York

                                   _____
                                      NAOMI REICE BUCHWALD
                                   UNITED STATES DISTRICT JUDGE

---

[10]    The Court is aware that the parties requested oral argument on defendants' motion. ECF Nos. 30, 38. However, because defendants' motion presents straightforward, well-settled legal issues governing the claims in this case that can be resolved on the existing record, the Court has concluded that oral argument is unnecessary. See Mir v. Shah, 2012 WL 6097770, at *4 (S.D.N.Y. Dec. 4, 2012); see also Katz v. Morgenthau, 892 F.2d 20, 22 (2d Cir. 1989).

[11]    Defendants request, in the conclusion of their motion, that the Court "award Defendants, in accordance with the WTA By-Laws, their attorneys' fees and costs[.]" Mot. at 27. As plaintiff points out, "Defendants did not brief on this issue[.]" Opp. at 23. Indeed, defendants do not even provide a citation to the relevant provision of the By-Laws to which they refer, and they acknowledge that their motion to dismiss is not "the appropriate time to brief this issue[.]" ECF No. 37 at 12 n.8. Considering the absence of briefing on this issue, the Court denies defendants' request for attorneys' fees and costs without prejudice to renewal.